## UNITED STATES of America, Plaintiff-Appellee.

v.

## Vincent BELTEMPO, Guiseppe Gallina, a/k/a "Fillipo", and Barbara Walberg, Defendants-Appellants.

### Nos. 612, 648 and 649, Dockets 81–1392, 81–1394 and 81–1396.

United States Court of Appeals, Second Circuit.

Argued Jan. 26, 1982.

Decided March 23, 1982.

Certiorari Denied June 21, 1982. See 102 S.Ct. 2963.

---

Gerald Alch, Boston, Mass. (Joseph S. Oteri, Martin G. Weinberg, James W. Lawson, Oteri & Weinberg, Boston, Mass., of counsel), for defendant-appellant Beltempo.

James O. Druker, Mineola, N. Y. (Paula Schwartz Frome, Kase & Druker, Mineola, N. Y., of counsel), for defendant-appellant Gallina.

David Ely, New York City (Alan Scribner, Ivan S. Fisher, New York City, of counsel), for defendant-appellant Walberg.

Reena Raggi, Asst. U. S. Atty., E. D. N. Y., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., John Latella, Asst. U. S. Atty., E. D. N. Y., Brooklyn, N. Y., of counsel), for the United States of America.

Before MESKILL and CARDAMONE, Circuit Judges, and HOLDEN, District Judge.[*]

CARDAMONE, Circuit Judge:

In February 1981 United States Customs officials at Kennedy International Airport in New York discovered sixteen pounds of heroin concealed in the false bottoms of suitcases belonging to a couple attempting to enter the United States. Carefully deploying their investigative nets the authorities discovered six others whom they indicted along with this couple as part of a conspiracy to smuggle heroin into the country. The indictments charge that from mid-January to mid-February 1981 these eight individuals attempted to smuggle forty—and actually smuggled twenty-four—pounds of heroin from Palermo, Sicily to New York. In the haul that followed only five of the conspirators were caught; three remain at large. Of the five that were apprehended, one plead guilty on the eve of trial, one was acquitted at its conclusion, the remaining

three were found guilty after a jury verdict and are before us on this appeal.

Vincent Beltempo, charged with having conspired unlawfully to import heroin in violation of 21 U.S.C. § 963 (Count I), with twice having unlawfully imported heroin, first on January 17, 1981 and then on February 7, 1981, in violation of 21 U.S.C. §§ 952(a) and 960(a)(1) (Counts III and VI), and with twice having unlawfully possessed heroin intending to distribute it in violation of 21 U.S.C. § 841(a)(1) (Counts IV and VII), was found guilty on all five counts. He is presently serving concurrent terms of fifteen years imprisonment on each count, was fined $25,000 on each count, for a total fine of $125,000, and was given lifetime special parole on the substantive counts.

Giuseppe Gallina, charged with having conspired unlawfully to import heroin in violation of 21 U.S.C. § 963 (Count I), with having distributed heroin abroad intending that it be unlawfully imported into the United States, in violation of 21 U.S.C. § 959 (Count II), and with having unlawfully imported heroin into the United States on January 17, 1981 in violation of 21 U.S.C. §§ 952(a) and 960(a)(1) (Count III), was found guilty on all three counts. He is presently serving concurrent terms of twelve years imprisonment on each count, was fined $25,000 on each count, for a total fine of $75,000, and was given lifetime special parole on the substantive counts.

Barbara Walberg, charged with having conspired unlawfully to import heroin in violation of 21 U.S.C. § 963 (Count I), with having unlawfully imported heroin into the United States on February 7, 1981 in violation of 21 U.S.C. §§ 952(a) and 960(a)(1) (Count VI), and with having unlawfully possessed heroin intending to distribute it in violation of 21 U.S.C. § 841(a)(1) (Count VII), was found guilty on all three counts. She was sentenced to concurrent terms of two years imprisonment on each count, and given eight years special parole on the substantive counts. She is free on bail pending the outcome of this appeal.

---

[*] Honorable James S. Holden, Chief Judge of the United States District Court for the District of Vermont, sitting by designation.

## THE TRIAL

The government's principal witness at trial was Antonia Ganguzza who stated that in early January 1981 she was romantically involved with Anthony Beltempo ("Tony"), defendant Vincent Beltempo's nephew.[1] Under a grant of immunity she testified that Tony persuaded her to accompany him on a trip to Italy for the purpose of carrying back drugs, for which he agreed to pay her $10,000. On January 13 she, Tony and Paul Galgano[2] flew to Palermo, Sicily where they met Tony's "Uncle Jimmy," identified by her at trial as defendant Vincent Beltempo. Vincent Beltempo later introduced her to a man called "Phillipe," whom she identified in court as defendant Giuseppe Gallina.

On January 15, 1981 Ganguzza, Galgano and the two Beltempos again met with Gallina who took them shopping for the clothing they would need to conceal the packages they planned to carry. Later that day Vincent Beltempo, Gallina, Ganguzza and Galgano went to Gallina's apartment. They were subsequently joined there by Tony Beltempo and Ronald Rizzo.[3] At the apartment Ganguzza and Galgano dressed in the undergarments they had recently purchased, concealing under them ten one-pound packets of heroin. The two Beltempos and Gallina then appraised their appearance to make sure that neither looked "too bulky." That evening Tony Beltempo, Ganguzza, Galgano and Rizzo left for Rome. They were taken to the train station in two cars, one driven by Giuseppe Gallina and one by his brother Salvatore.[4]

The four arrived in Rome on January 16, 1981, carrying the heroin packets. Although they already had round-trip tickets, Tony Beltempo sent Galgano to purchase new return trip tickets to New York for the two of them and Ganguzza because of Vincent Beltempo's warning that the trio might arouse the suspicion of customs officials in New York were their tickets to show too short a stay.

The following day Tony Beltempo, Galgano and Ganguzza prepared to leave Rome and return to New York. Ganguzza concealed seven heroin packets on her body; Galgano concealed three. Tony Beltempo advised the two couriers that when they arrived in New York each should go through customs as if traveling alone. He further warned them not to get excited if they saw him being questioned since his name was in "a computer." Following these directions the two couriers and Beltempo successfully smuggled the drugs through customs at Kennedy Airport and then went to a New Jersey motel where Ganguzza and Galgano gave the heroin packets to Tony Beltempo. The following day Tony Beltempo paid Ganguzza $10,000 for her part in the smuggling venture.

Promised another $10,000 if she would act as a courier again, Ganguzza left New York on Monday January 26, 1981 arriving in Rome, Italy the following day. She checked into the Metropole Hotel, called Rizzo and arranged to meet him. Rizzo came to the hotel accompanied by a woman whom he introduced as "Barbara," identified by the witness at trial as the defendant Barbara Walberg. In Walberg's presence Ganguzza asked Rizzo "what was going on," where the "stuff" was and when she was to leave. Rizzo told her there was "nothing here yet," and that he "hadn't heard from anybody."

On February 1, 1981 Rizzo telephoned Ganguzza to say that he and Walberg would be coming over to her hotel. They arrived accompanied by a man identified as "Sal," whom Ganguzza recognized from her previous trip as Giuseppe Gallina's brother. Walberg told Ganguzza that there had been a change in plans, that they would all be

1. Anthony Beltempo, an indicted co-conspirator, is still at large.

2. Paul Galgano is another indicted but unapprehended co-conspirator.

3. Rizzo, one of the couriers, plead guilty on the eve of trial and was sentenced to four years incarceration and six years special parole.

4. Salvatore Gallina, brother of defendant Giuseppe Gallina, is the third co-conspirator still at large.

going first to Sicily and that "Sal" would explain. When the four of them arrived in Sicily they went to the same apartment where Ganguzza had first seen the heroin on her earlier trip. Salvatore Gallina explained that he shared this apartment with his brother "Phillipe," whom he said had returned to New York. Gallina informed the three couriers that instead of carrying the heroin concealed on their bodies, they would carry false bottom suitcases. On the morning of February 7, 1981 Rizzo, Walberg, Ganguzza and Salvatore Gallina left the apartment where they had all been staying and drove to the airport. There the group was approached by a man introduced by Salvatore Gallina as "Joe," identified at trial as the defendant, Giuseppe Aiello.[5] Gallina had told Walberg and Ganguzza earlier that "an Italian" would travel with them from Italy and that the group should act like a family. The flight from Palermo to New York was uneventful and, after she cleared customs, Ganguzza called Tony Beltempo who arranged to meet her in New Jersey.

Beltempo was surprised to learn that these packages of heroin were concealed in suitcases and not carried on the couriers' bodies. Unable to find the heroin packets in the suitcases, he told Ganguzza they would take the suitcases and go meet his "Uncle Jimmy." From there the three of them went to Vincent Beltempo's apartment on the Upper East Side of Manhattan. At the apartment Ganguzza told Vincent Beltempo in more detail about what had happened, while Tony took a screwdriver and punched a hole in the center of one of the suitcases. White powder spilled onto the rug. With a knife and hammer Tony chiseled around the outside of the suitcase until he could remove the outer shell. Taped inside were thin packets of heroin.

On April 1, 1981, pursuant to a search warrant, Drug Enforcement Administration (DEA) chemist Stanley Blashof searched Vincent Beltempo's apartment for traces of heroin. He testified that heroin traces were found in a vacuum cleaner bag, on a screwdriver and in the living room rug.

The defendants raise a number of issues on this appeal, several of which warrant discussion. These contentions will be analyzed in the context of the facts and law applicable to each.

## DISCUSSION

### I.  *Vincent Beltempo*

The principal thrust of Beltempo's argument before us is that the district court incorrectly failed to suppress evidence of the heroin traces found in his apartment. He claims (1) that the search warrant procured by the DEA was based on information obtained over 50 days prior to the application and that it should therefore fail for lack of probable cause; and (2) that he was denied due process of law because the government destroyed the evidence seized in his apartment.

The application for the warrant was made on April 1, 1981 by Special Agent Stia of the DEA. On information and belief, he alleged that there was presently being concealed at apartment 12–M 400 East 71st Street, New York "traces of heroin, and screwdrivers, hammers and other tools used for extracting heroin from false bottom suitcases." He set forth the source of his information as Antonia Ganguzza who advised him, at an unspecified time, that on February 7, 1981, she smuggled drugs into the United States from Italy in false bottom suitcases. He related that she advised him of her trip to Vincent Beltempo's apartment on the Upper East Side. He stated that investigation revealed the apartment described was leased to Beltempo. She told him, he continued, of the tools used to open the suitcases and that she observed a small quantity of heroin spilled on the rug in the process. A DEA chemist advised Stia that traces of heroin can be found in a rug "even after a period of some months." He was told that if the rug had been vacuumed, traces may be found in the vacuum cleaner bag and the tools used if they came into contact with heroin might have traces as well.

**5.**  Aiello, an alleged courier, was acquitted at    trial.

On the same day Magistrate Raby issued a search warrant to examine the apartment for these traces. Defendant claims that the issuance of this warrant on April 1, 52 days after the date when Ganguzza was in the apartment, was improper because it was based on stale information insufficient to support claimed probable cause to search.

The Fourth Amendment to the Constitution protects against unreasonable searches and seizures by providing that no search warrant shall issue "but upon probable cause." A neutral magistrate must be satisfied that there is "probable cause" to believe that grounds for the application exist before he issues a warrant. Fed.R.Crim.P. 41(c). Probable cause to issue a warrant looks first to the adequacy and reliability of the observation. Specificity assured, currency is considered. To justify a present search probable cause must be current and not rest on facts which existed in the past, unless there is reason to believe those facts are still in existence. 3 C. Wright, Federal Practice and Procedure § 662 at 23 (1969).

The general principles governing the delay between the known existence of facts and the issuance of a warrant were set forth by Chief Justice Hughes in *Sgro v. United States*, 287 U.S. 206, 53 S.Ct. 138, 77 L.Ed. 260 (1932). "While the statute does not fix the time within which proof of probable cause must be taken by the judge or commissioner, it is manifest that the proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time. Whether the proof meets this test must be determined by the circumstances of each case." *Id.* at 210–11, 53 S.Ct. at 140. In viewing the "circumstances" to determine whether probable cause exists in a given case, there should be applied "practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). Further, in considering

whether the time lapse is reasonable, heavy reliance is placed on the nature of the offense. Where the activity is of a continuing nature a greater time lapse is justified than where the offense is an isolated one. Comment, A Fresh Look at State Probable Cause: Examining the Timeliness Requirement of the Fourth Amendment, 59 Iowa L.Rev. 1308 (1974); 68 Am.Jur.2d Searches and Seizures § 70 (1973); see cases collected at Annot., 100 A.L.R.2d 525 (1965).

The question here is whether probable cause existed at the time the warrant issued to believe that the heroin observed on February 7, 1981 was still to be found on Beltempo's rug, or whether so long a period of time had passed as to make it doubtful that the drug was still there. *United States v. Ramirez*, 279 F.2d 712, 715 (2d Cir.), *cert. denied*, 364 U.S. 850, 81 S.Ct. 95, 5 L.Ed.2d 74 (1960); *United States v. Brinklow*, 560 F.2d 1003, 1005 (10th Cir. 1977), *cert. denied*, 434 U.S. 1047, 98 S.Ct. 893, 54 L.Ed.2d 798 (1978).

Were this case to be viewed as one involving a continuing offense—and a persuasive argument can be made that conspiracy to smuggle heroin into the United States fits that description—that would end the discussion, for a 52 day lapse would not vitiate probable cause in an ongoing scheme of illegal importation. But the affidavit upon which the search warrant issued contained no allegation that such was the fact. It referred only to the single February 7, 1981 incident when the informant Ganguzza was present in defendant Vincent Beltempo's apartment.

In this isolated incident type of case[6] some courts have focused solely on the element of time that has elapsed. The court in *Schoeneman v. United States*, 317 F.2d 173, 177 (D.C.Cir.1963) stated that no case could be found that sustained a search warrant issued more than 30 days after the finding of evidence, and one commentator

---

**6.** The isolated nature of the activity was made plain from the language of the affidavit where the DEA Agent discussed the opening of the false bottomed suitcases using household tools:

"In the course of this procedure, a small quantity of heroin was spilled onto the living room rug."

has concluded that a lapse of more than seven weeks has always rendered a search warrant nugatory, Annot., 100 A.L.R.2d at 527.

Adopting an arbitrary "cut-off" expressed in days or weeks beyond which probable cause ceases to exist, in our view improperly substitutes a rigid formula for the informed judgment which it is the duty of a magistrate to exercise. Factors as important as the time element to be considered in determining the existence of probable cause· include the nature of the object sought, its location on the premises and the state in which it was observed. The nature of the objèct would encompass such considerations as whether it is large or small, moveable or fixed, disposable or permanent and innocuous or incriminating. The location of an object on the premises would involve, for example, whether it was in plain sight on a table, locked in a safe, on a beam in a cellar or secreted behind a bricked-in wall. The state in which the object was seen is especially important today because modern technology and equipment have the sophisticated capacity to ascertain whether matter—in whatever form it may be—is present or even may have once been present. This technology can detect, for example, a blood stain on clothes, furniture or rug; a gas that evaporates; a solid that dissolves and disappears, or one that changes into a powder or a liquid that seeps into a fabric, or dust that is suspended in air and whose particles may later be found on the top ledge of a door. The inquiry with respect to probable cause in the case of an observation of an isolated incident should focus on all of the relevant circumstances, including the element of time lapse, to determine the probability of the continued existence of the object sought at the place where it was last seen. The overall approach should be one of flexibility and common sense. *Compare United States v. Dauphinee*, 538 F.2d 1, 5 (1st Cir. 1976) (search· upheld after 30 days elapsed where the objects were hand grenades); *United States v. Rosenbarger*, 536 F.2d 715, 719–20 (6th Cir. 1976), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977) (search

upheld where 21 days elapsed in search for possession of firearms); *United States v. Steeves*, 525 F.2d 33, 38 (8th Cir. 1975) (search valid after 87 days where object of search was two rifles); *and United States v. Rahn*, 511 F.2d 290, 292–93 (10th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975) (warrant for search for weapons upheld after two years, citing *Neal, infra* ); *with United States v. Neal*, 500 F.2d 305, 309 (10th Cir. 1974) (search warrant invalid after three months lapse where object was stolen credit cards and stolen auto parts); *and Rosencranz v. United States*, 356 F.2d 310, 315–18 (1st Cir. 1966) (warrant invalid where no time is alleged in the affidavit as to when the object was last observed on the premises).

Were we merely to count the number of days between Ganguzza's observation and the date of the warrant's issuance, this could arguably be a close case. Even were it to be considered doubtful, however, a presumption of regularity attaches to official acts so that a magistrate's finding of probable cause is itself a substantial factor tending to uphold the validity of the warrant. *United States v. Jackstadt*, 617 F.2d 12, 13 (2d Cir. 1980), *cert. denied*, 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1981); *see United States v. Ventresca*, 380 U.S. 102, 106, 85 S.Ct. 741, 744, 13 L.Ed.2d 684 (1965).

In any event this is not a close case when viewed in a common sense manner. The object sought was small and although its possession was incriminating, it was innocuous in its hidden location within the pile of a rug. The heroin sought here was a powder that does not dissolve or evaporate and whose presence an expert indicated lingers for a period of some months. Traces of the spilled narcotic were likely to remain in a rug, even one that had been vacuumed. The tools used by Beltempo to pry open the false bottoms of suitcases are ordinarily kept on the premises and not likely to have been washed or cleaned. Here a common sense view of all the circumstances belies the contention that a time lapse alone precludes the existence of probable cause. *See*

*Andresen v. Maryland,* 427 U.S. 463, 478–79 n.9, 96 S.Ct. 2737, 2747–2748 n.9, 49 L.Ed.2d 627 (1976). Thus, the validity of this warrant should be upheld.

■ The issue of the destruction of the heroin traces is more readily disposed of. Intentional destruction is a serious matter that may involve imposition of sanctions, even a new trial. *See United States v. Bufalino,* 576 F.2d 446, 449 (2d Cir.), *cert. denied,* 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978). In *United States v. Grammatikos,* 633 F.2d 1013, 1019–20 (2d Cir. 1980), we said "the appropriateness and extent of sanctions in such situations depends upon a case-by-case assessment of the government's culpability for the loss, together with a realistic appraisal of its significance when viewed in light of its nature, its bearing upon critical issues in the case and the strength of the government's untainted proof." We note that this was not an intentional destruction. Rather, it was a good faith loss that came about as a necessary consequence of the method used to analyze the scrapings and sweepings which consumed the heroin in the process.[7] As such it does not invoke the sanction of exclusion of the evidence particularly where, as here, the expert who performed the scientific tests is available for cross-examination. *United States v. Love,* 482 F.2d 213, 218–19 (5th Cir.), *cert. denied,* 414 U.S. 1026, 94 S.Ct. 453, 38 L.Ed.2d 318 (1973); *see United States v. Augenblick,* 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969). In the instant case, moreover, pursuant to Fed. R.Crim.P. 16(a)(1)(D) defendant was offered an opportunity to examine and test for any scrapings that could be extracted from the vacuum cleaner bag since only the contents of the bag had been tested, not the bag itself. Under these circumstances, it is difficult to credit defendant's argument that *Brady* material was wrongfully denied him, since there is not the slightest suggestion that the prosecution suppressed evidence which would have been favorable to

him. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

## II. *Barbara Walberg*

■ Walberg argues that the trial court's exclusion of an exculpatory hearsay statement made by co-defendant Rizzo before a United States Magistrate requires reversal and a new trial.

Rizzo, who plead guilty, and Walberg were the couple traveling from Italy. It was they who were caught by customs inspectors in February at the same time that Tony Beltempo and Antonia Ganguzza successfully smuggled the heroin in their suitcases past the customs officers. The statement sought to be introduced was made by Rizzo when he and Walberg appeared before the United States Magistrate for their initial appearance. Rizzo told the Magistrate that Walberg "had nothing to do with [the smuggling conspiracy]." The proceedings were not transcribed and no written offer of proof was made. Rizzo did not appear as a witness at the trial.

The statement was offered as a declaration against the penal interest of an unavailable declarant. Fed.R.Evid. 804(b)(3) provides, in pertinent part: "A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." In *Chambers v. Mississippi,* 410 U.S. 284, 300–01, 93 S.Ct. 1038, 1048, 35 L.Ed.2d 297 (1973), the Supreme Court held that to be admissible the hearsay statement must be made by an unavailable declarant, spontaneously and in close temporal proximity to the crime, corroborated by some other evidence in the case, and self-incriminatory against the declarant's penal interest. This court has also held that Rule 804(b)(3) as well as *Chambers* require corroborating circumstances that clearly indicate the trustworthiness of the hearsay statement. *United States v. Guillette,* 547 F.2d 743, 754 (2d Cir. 1976),

---

7. The Government concedes that in the particular circumstances here the better course may have been to notify the defendant that the her-

oin traces would be destroyed in the process of testing so that the accused could better guard against the claim he now advances.

*cert. denied,* 434 U.S. 839, 98 S.Ct. 132, 54 L.Ed.2d 102 (1977).

The district court properly found that declarant Rizzo was unavailable because he asserted his Fifth Amendment right by refusing to testify. *United States v. Thomas,* 571 F.2d 285, 288 (5th Cir. 1978). The court also correctly held that the statement made was against his penal interest. It satisfied *Chambers* in that it could be found to be spontaneous and close in time to the crime.

Nevertheless, there was insufficient corroboration in the record to establish the trustworthiness necessary to make Rizzo's hearsay remark admissible. Culling from defendant Walberg's own brief, it appears that Ganguzza, after meeting Rizzo in the Rome hotel lobby and while Walberg was with him, spoke with Rizzo about which method of smuggling would be used. Afterwards, while in Palermo there was "a lot of" drug related conversation among the group of couriers. Brief for Appellant Walberg at 5. Walberg and the others gave their clothing (new clothing that Walberg had just purchased) to Salvatore Gallina to pack in new suitcases for them. She threatened to "turn them in" if any of her recent purchases were lost, *id.* at 6, and expected to be paid for making the trip.[8]

The standard for appellate review of an exclusion under Rule 804(b)(3) is whether the trial court abused its discretion. *United States v. Poland,* 659 F.2d 884, 895 (9th Cir. 1981). In light of the above evidence it was not an abuse of the trial court's discretion to exclude Rizzo's hearsay statement.

### III. *Giuseppe Gallina*

Gallina raises several issues, none of which require more than brief discussion.

■ Defendant contends that the evidence in the record establishes the existence of two conspiracies, but that the proof connects him with only one. He was present in Italy as "Phillipe" on the January body-carry smuggle and he conceded that the proof connects him with that crime. But in February he was in New York City and claims that he could not have been a participant in the illegal importation by false-bottom suitcases. The government asserts that there was only one ongoing conspiracy.

A jury verdict must be sustained where the evidence viewed in a light most favorable to the government supports it. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). So viewed, the Gallina brothers were heroin suppliers for both the January and February transactions because they had reached an agreement with the Beltempos to furnish heroin in Italy to be smuggled into the United States by various couriers. This proof constitutes the "agreement" which is the gist of the crime of conspiracy. *United States v. Borelli,* 336 F.2d 376, 384 (2d Cir. 1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). Unlike *United States v. Bertolotti,* 529 F.2d 149 (2d Cir. 1975), relied upon here by defendant, this is not a "spillover" involving evidence of separate multiple conspiracies and individuals totally unconnected with one another. *See also Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. Cambindo Valencia,* 609 F.2d 603 (2d Cir. 1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980). Rather the proof shows this to be a single narcotics distribution scheme involving closely related individuals with a common purpose to effect smuggling by whatever method appeared best at the time. The principal participants and their agreement to smuggle heroin from Italy to the United States by means of couriers remained constant.

■ Defendant claims that proof is lacking that the substance involved in the January transaction was heroin. The jury found Gallina guilty of conspiracy for both the

---

8. Walberg's defense was that she was an innocent dupe of Ronald Rizzo with whom this 27 year old defendant was romantically involved. Her parents and a family friend testified that they urged her to take the trip with her boyfriend Rizzo as a chance to see Europe. As the Assistant United States Attorney argued before us, however, this testimony failed to establish her innocent lack of knowledge and was not believed by the jury since no daughter would tell her mother that she was going to Italy to smuggle heroin back into the United States.

January and February transactions. The heroin imported in February was intercepted at customs and was in evidence. Further, as defendant concedes, the nature of the substance may be proved by circumstantial evidence. Brief for Appellant Gallina at 20. All the facts considered as a whole—*e.g.*, white powder, $10,000 paid to one courier to carry it, extreme secrecy used, the February shipment was heroin—provide ample circumstantial evidence that the January shipment was also heroin. *See, e.g., United States v. Atkins*, 473 F.2d 308, 314 (8th Cir.), *cert. denied*, 412 U.S. 931, 93 S.Ct. 2751, 37 L.Ed.2d 160 (1973); *United States v. Fiotto*, 454 F.2d 252, 254 (2d Cir.), *cert. denied*, 406 U.S. 918, 92 S.Ct. 1769, 32 L.Ed.2d 117 (1972).

■ Question is raised concerning the admissibility of a $20,000 check drawn in 1979 and cashed by defendant at a Swiss bank. The defense attempted to portray Gallina as a person of modest, even reduced, means through the testimony of his wife. The government countered by introducing three checks totalling $75,000 made out to Gallina all dated January 29, 1981 (shortly after the first smuggling trip). There is little dispute about their relevancy and admissibility. At issue is the $20,000 check which was admitted, but was dated November 1979, about 13 months prior to the incidents for which defendant was on trial. The proof showed that it was cashed by defendant at a bank in St. Gall, Switzerland. At trial Gallina objected to its relevancy; he now claims that it tended to show the commission of prior criminal acts.[9]

Mrs. Gallina's testimony had not been restricted to the Gallina's present financial picture. She had stated that her middle-aged husband owned a laundromat and occasionally visited a family meat market in Brooklyn. She said that he went to Italy for the weather and for his heart condition. While there she claimed that they stayed at his father's house because they did not have an apartment of their own. She also testified that they owned only one car, never ate out, never travelled except for health reasons and never even went to the movies. To create this image of a poor Brooklyn butcher the defense, as in the line from "Oklahoma," went about as far as it could go. We believe that the 1979 check was plainly relevant in view of Mrs. Gallina's testimony.

■ The last two issues involve severance and the claimed bias of a juror. Neither has merit. First, defendant did not move for severance prior to trial and only moved after the verdict for a new trial on the grounds of improper joinder. Such a motion not having been timely made was waived. Fed.R.Crim.P. 12(b)(5) and 12(f). Second, one of the jurors wrote a love letter to the Assistant United States Attorney and invited her to lunch or dinner. He sent a picture of himself and a poem. In commendable fashion the Assistant United States Attorney brought the entire matter to the attention of the trial court and defense counsel. The circumstances disclosed here are not at all similar to those outlined in *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1953), where a private communication *to a juror* during a trial required a hearing to determine whether the incident prejudiced the accused on trial. Further, Federal Rule of Evidence 606(b) provides that after a verdict a juror "may not testify as to . . . the effect of anything upon his . . . mind or emotions as influencing him to assent to . . . the verdict. . . ." The many sound reasons for not inquiring into a juror's state of mind are fully set forth in *United States v. Dioguardi*, 492 F.2d 70, 78–80 (2d Cir.), *cert. denied*, 419 U.S. 829, 95 S.Ct. 49, 42 L.Ed.2d 53 (1974). No recognized ground is presented to impeach the verdict on this issue.

With respect to defendant Walberg the mandate of the court shall issue forthwith.

---

**9.** Fed.R.Evid. 404(b) provides:

Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The judgments of conviction in each case are affirmed.