Lawrence **THORNTON**, Appellant
(Defendant Below),

v.

**STATE of Indiana**, Appellee
(Plaintiff Below).

No. 64A04–9409–CR–357.

Court of Appeals of Indiana.

July 12, 1995.

James V. Tsoutsouris, Public Defender of Porter County, Roy G. Moutaw, Deputy Public Defender, Portage, for appellant.

Pamela Carter, Atty. Gen., Lisa M. Paunicka, Deputy Atty. Gen., Indianapolis, for appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Lawrence Thornton appeals from the jury's verdict finding him guilty of two counts of child molesting, class D felonies; two counts of child molesting, class C felonies; and two counts of incest, class D felonies.

We affirm.

### ISSUE

I.  Whether the trial court erred in admitting the testimony of J., one of Thornton's daughters.

II. Whether the trial court erred in admitting the rebuttal testimony of Carla Rollins and Tracy Clifft.

### FACTS

The evidence favorable to the verdict indicates that Thornton was divorced from his first wife during the 1970's. The three daughters born of the marriage resided with their mother after the divorce, and Thornton had little contact with them over the years. When she was approximately fourteen, C., Thornton's oldest daughter, requested that she be allowed to live with Thornton and his

girlfriend. Thornton agreed. Later, J., Thornton's middle daughter who was approximately twelve, asked to live with Thornton, and he agreed. The girls wanted to move in with their father because he admittedly allowed them to drink alcohol and smoke cigarettes.

After Thornton began fondling both girls, and engaging in intercourse with J., C. moved away. Thornton and J. then moved to a trailer where Thornton continued to engage in intercourse with J. J. then contacted her sister L., who was approximately 13 years of age at that time, and begged L. to move into the trailer. After L. moved in, she and J. slept with Thornton in his bed. Thornton fondled both girls. Later, the trio moved back to Thornton's girlfriend's home, where Thornton engaged in sexual intercourse with both girls. On one occasion, Thornton took the girls to a Motel 6 where he rented a room, provided the girls with alcohol, and engaged in sexual intercourse with each of them.

L. left the home, and soon thereafter reported the sexual abuse to Detective Kiser of the Portage Police Department on November 4, 1991. J. gave statements to welfare caseworkers and Detective Kiser on November 6 and 22, 1991. Thornton was charged with, and a jury convicted him of, four counts of child molesting and two counts of incest for the acts he perpetrated against C., J., and L. Additional facts will be presented in our discussion of the issues.

### DECISION

#### I. J.'S TESTIMONY

Thornton contends the trial court erred in allowing J. to testify at trial. We disagree.

At some point after giving statements to the welfare caseworkers and Detective Kiser, J. was placed in a foster home. On February 21, 1992, a CHINS proceeding was held to determine whether J. was a child in need of services. At the hearing, Dr. Stan Lelak, a licensed clinical psychologist, testified 'that J.'s foster mother brought J. to see him because "[t]here was some talk that J. may have different persons inside of her that sometimes come out." (R. 48–9).

As a result of her initial interview with Dr. Lelak, J. was placed in the Juvenile Detention Center that evening. The next morning, Dr. Lelak visited J. and spoke with two other personalities, Mary and Jay. Dr. Lelak visited with J. on an out-patient basis once a week from December, 1991, until approximately February 4, 1992 when he was notified by welfare caseworkers that either J., or another of her personalities, had run away from Chesterton High School. Not knowing if J. was a danger to herself or others, Dr. Lelak ordered that she be hospitalized. Once in the hospital, Dr. Lelak saw J. almost every day during her one week stay.

Altogether, Dr. Lelak testified, J. possessed six personalities, including that of J. Dr. Lelak explained the function of these personalities as follows:

> Typically ... multiple personality disorder, all personalities have a role, or a function, or a job, and all of these jobs or functions are to protect the primary personality or the presenting personality from different kinds of stresses or trauma that may have occurred in their lives. Based on my review of the literature, my work and everything that was reported, the abuse, in order, is sexual, physical, emotional. Those are the things that the other personalities typically prevent the presenting one from learning about.

(R. 52).

Thornton's trial counsel cross-examined Dr. Lelak at the CHINS proceeding in part as follows:

> Q. Do you have the name of the personality that is being sexually abused?
>
> A. To the best of my recollection, it is DEE. D–E–E, as far as I can tell.
>
> Q. Do you know the age of Dee?
>
> A. Oh, as to the best of my knowledge now, I believe all the ages have been *integrated* to about fourteen and three-quarters or almost fifteen, which is J.'s chronological age. My first contact with Dee was approximately, she was approximately age eleven.

(R. 57) (emphasis added).

Thereafter, based upon Dr. Lelak's testimony noted above, Thornton filed a motion in

limine alleging that J.'s testimony at his trial would be "inherently unreliable," and that she "should be deemed incompetent to testify." (R. 40). Specifically, Thornton argued that J.'s multiple personality disorder affected her perception and memory of events and that her memory was inaccurate because it had been impermissibly enhanced by psychotherapeutic techniques which are analogous to hypnosis. As a result, Thornton contended, J.'s testimony would not only violate his constitutional right to confront his accuser, but would also amount to hearsay.

The trial court found that "[J.] is not disqualified from testifying by reason of her multiple personality disorder or by reason of the treatment rendered to merge the multiple personalities," (R. 157), and denied Thornton's motion.[1]

Prior to the prosecution calling J. as a witness at trial, Thornton questioned J. outside the presence of the jury concerning her multiple personality disorder and treatment, and lodged a specific and continuing objection to J.'s testimony. The trial court overruled Thornton's objection and J. testified. Thereafter, Thornton called Dr. Lelak as a witness and questioned him concerning J.'s diagnosis and treatment.

Thornton now argues the trial court erred in allowing J. to testify because, he alleges, her therapy rendered her incompetent to testify. We note that Thornton's argument in large part relies upon facts concerning the specifics of Dr. Lelak's diagnosis and treatment of J.'s multiple personality disorder which were elicited from Dr. Lelak at trial. We remind Thornton that many of those facts were not before the trial court when it ruled upon Thornton's motion in limine; nor, were those facts before the trial court prior to his objection to J.'s trial testimony. Therefore, in determining whether the trial court erred in allowing J. to testify, we will confine our review to the facts elicited at the CHINS proceeding as well as those given by J. prior to her trial testimony.

Both in his motion in limine and his appellate brief, Thornton posits that J.'s memory has been enhanced through a process known as "confabulation." In support of his hypothesis, he directs our attention to *Rowley v. State* (1985), Ind., 483 N.E.2d 1078, wherein our supreme court held as follows:

> [E]vidence derived from a hypnotically entranced witness [is] inherently unreliable as not having probative value and [is] therefore inadmissible. Such evidence should be excluded because hypnotically induced evidence is affected by confabulation, a process whereby the hypnotic subject fills in memory gaps with fantasy. The post-hypnotic subject is confident that any memory recalled is accurate and factually based, a conviction which cannot be tested through cross-examination.

*Id.* at 1081 (citations omitted).

Thornton points out that, according to Dr. Lelak's testimony, the nature of multiple personality disorder indicates that J. had no independent memory of the sexual abuse because "Dee" protected J. Therefore, he argues, the "integration" of J.'s personalities enhanced J.'s memory "to the point of absolute certainty about the events in question," Appellant's Brief at 23, producing a "high risk of confabulation." *Id.* at 22. By way of example, he points to J.'s testimony at the CHINS proceeding wherein J. responded to questions by the guardian ad litem as follows:

Q. J., when you talked to [the caseworker], when you had that long talk with her, is everything you told her about you and your dad, is that true?

A. That I can remember, yeah.

Q. And do you now, J., do you remember having sex with your father?

A. Yeah.

<hr/>

1. The trial court's order denying Thornton's motion in limine also indicates as follows:

> [T]he State appeared by Deputy–Prosecuting Attorney Brian T. Gensel and Defendant appeared by counsel, John M. Rhame, III, and informed the Court that it was not necessary to present evidence on the motion but that the parties wished to present written argument on

the legal issues involved. A time schedule was established for filing those written arguments. (R. 157). Apparently, Thornton did not wish to hold a hearing on the issue of J.'s competency, and the record does not reveal that such a hearing was held. Furthermore, on appeal, Thornton does not claim the lack of a competency hearing to be an error.

Q. And earlier did J. remember that?

A. Well, sometimes, and sometimes I didn't.

Q. So, it's you today and the person you are right now, do you completely recall having sex with your father?

A. Yeah.

(R. 96).

Thornton then argues that the risk that J.'s memory has been enhanced through confabulation renders her an incompetent witness and denies him of his right to effective cross-examination and, thus, of his right to confront his accuser. Furthermore, with respect to his hearsay argument, Thornton asserts:

[t]he risks of confabulation; of 'filling in the gaps with fantasy' should be self evident when one considers the inherent vulnerability of this fourteen year old child. It must be concluded that the process of institutionalization and therapeutic integration resulted in out-of-court statements made by J.'s protector personalities to J., concerning the details of the alleged abuse.

Appellant's Brief at 30.

▪ A witness is presumed to be competent. Ind.Evidence Rule 601; *Bellmore v. State* (1992), Ind., 602 N.E.2d 111, 117, *reh'g denied.* The defendant has the burden of establishing that the witness is not competent. *Ware v. State* (1978), 268 Ind. 563, 376 N.E.2d 1150, 1151. The determination of a witness's competency is a matter committed to the sound discretion of the trial court, whose determination is reviewable only when a manifest abuse of discretion has occurred. *Hughes v. State* (1989), Ind., 546 N.E.2d 1203, 1209.

▪ Our review of the evidence elicited at the CHINS proceeding fails to reveal any facts with respect to J.'s treatment, other than the word "integrated" found in the excerpt of Dr. Lelak's cross-examination noted above. During the voir dire examination of J. conducted by Thornton's counsel prior to her trial testimony, J. admitted that Dr. Lelak treated her for multiple personality disor-

der and identified six personalities. J. also admitted that during her counseling sessions, Dr. Lelak talked to her "about trying to bring all those personalities back together to just be J.," (R. 494), and that he had referred to the process as "integration." Finally, she recalled that upon discharge from her one week hospitalization, Dr. Lelak informed her that she "had in fact ... integrated all of the personalities back to J." (R. 496).

Thornton's contentions that J.'s therapy rendered her an incompetent witness, and that her testimony not only violated his constitutional right to confrontation but also amounted to impermissible hearsay must fail because the above-mentioned facts do not indicate that J.'s "integration" therapy created a risk of confabulation. No details concerning her therapy were brought to light. Specifically, no facts were presented concerning the methods Dr. Lelak used to integrate J.'s personalities; nor, was there evidence that those therapy methods caused J. to "fill in memory gaps with fantasy"—the inherent problem with hypnosis therapy as described by our supreme court in *Rowley, supra.* In fact, the word "confabulation" was never mentioned. Furthermore, the discrepancies among J.'s various statements are not conclusively indicative of confabulation, as Thornton urges us to find, because there are any number of reasons a witness' statements might contain inconsistencies. Thus, aside from the speculative arguments Thornton advanced, we are unable to locate any evidence upon which the trial court could have concluded that J.'s integration therapy created a risk of confabulation—despite the fact that J. admitted at the CHINS proceeding that she, J., did not always remember having sex with her father.[2]

Thornton failed to carry his burden of establishing J.'s incompetency, and we cannot say the trial court abused its discretion in allowing J. to testify.

## II. REBUTTAL TESTIMONY

Thornton claims the trial court erred in allowing Carla Rollins and Tracy Clifft to testify on rebuttal. We disagree.

---

2. At trial, J. testified that she made up the various personalities in order to get herself out of trouble. In effect, she asserted that she faked

multiple personality disorder using information supplied by Dr. Lelak throughout her two month therapy.

Carla Rollins and Tracy Clifft are friends of Thornton's daughters who frequently visited Thornton's home. The girls testified during the State's case-in-chief as to their observations of Thornton's conduct with his daughters. Thereafter, Thornton took the stand in his own defense.

Thornton testified that he experienced declining sexual potency for several years. Specifically, he claimed that during the time his daughters lived with him, he was not able to maintain an erection. Thornton presented expert testimony which suggested that he suffered from a progressive physiological—as opposed to psychological—impotency, and that Thornton had become totally impotent as of the time of trial. As Thornton's witness, his ex-girlfriend testified that she experienced his waning sexual ability during the time Thornton's daughters lived with them, and that she accompanied Thornton to the doctor for impotency treatment.

The following colloquy took place between Thornton and the prosecutor during the State's cross-examination of Thornton:

Q. Same thing with L., her saying that you had intercourse with her, that you fondled her, that you lifted up her shirt in front of friends, none of those things happened?

A. None of this. I have touched none of my daughters. *I have touched none of their friends in a sexual way.*

(R. 959) (emphasis added).

After the defense rested, the State recalled Rollins and Clifft, and the trial court overruled Thornton's objection to their testimony. Rollins testified in part as follows:

A. I was at the trailer, and it was in the summer sometime. I was over at the trailer and he asked me to sit on his lap, and I sat on his lap. And he only had his underwear on. That's all he had on.

And he was hugging me and holding me, and he was not really going to let me up. And I said let me up. And he was being, you know—kissing my cheek and my neck and that.

And when I got up, he, I guess, said—made a comment which would mean that he had an erection.

Q. What was that comment?

A. He was laughing, and he stood up, and he was laughing, and I said, what? What?, you know, because I got like a bad chill like, you know.

And he says, oh, you just gave me something that I hadn't had in a long time. (R. 1035). Rollins also testified that Thornton placed his hand on her vagina while she was half-asleep, and that he touched her breasts and "butt" while giving her a back rub. Further, Rollins testified that she saw Thornton ask other girls to sit on his lap, kiss them, and give them hickeys. Finally, Rollins claimed Thornton gave her a necklace from which he suspended a ring. He instructed Rollins to tell boys the necklace was a gift from her boyfriend.

Clifft testified "I would sit on his [Thornton's] lap, and he would put his tongue in my mouth and touch my butt and my boobs." (R. 1048). Clifft also testified that Thornton opened the shower curtain while she was taking a shower at his home, and stared at her—despite her request that he leave. Moreover, Thornton gave Clifft a ring and told her never to forget him.

Thornton now claims Rollins' and Clifft's testimony concerning Thornton's prior sexual misconduct was improperly admitted because their testimony "was not offered for the limited purposes approved by Rule 404(b). Instead, this evidence was offered for the purpose of attacking Mr. Thornton's character." Appellant's Brief at 34. We disagree.

■ The scope of rebuttal evidence is within the trial court's discretion. *Heck v. State* (1990), Ind., 552 N.E.2d 446, 453. Evidence which explains, contradicts, or disproves the adversary's evidence may be competent rebuttal evidence. *Id.*

In *Koo v. State* (1994), Ind.App., 640 N.E.2d 95, *reh'g denied, trans. denied,* wherein the defendant was a doctor accused of raping his patient, we addressed an argument similar to that advanced by Thornton. The victim suffered from numerous gynecological disorders. She went to the defendant's office, disrobed, wrapped a sheet around her waist and sat on an examining

table. The defendant entered the room, grabbed her arm and gave her an injection of what he claimed was Valium. The defendant instructed the victim to position herself near the end of the examining table, and taped a corner of the sheet to an overhead light. While her feet were in stirrups, the victim felt something other than a speculum enter her vagina. She felt the defendant's body pressing back and forth and she felt his hands upon her legs. She then lifted the sheet, saw the defendant pull out and zip his pants.

At trial, the defendant presented evidence that the victim was a heavy user of drugs such as Valium, and implied the drugs caused her to hallucinate the rape. The State then presented the testimony of two other patients who described encounters with the defendant which were remarkably similar to that described by the victim. On appeal, the defendant claimed the trial court erred in admitting the testimony of the other patients in part because it did not fall within an articulated exception to the general rule disallowing such evidence.

We cited Ind.Evidence Rule 404(b) which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan knowledge, identity, or absence of mistake of accident ...,

and, citing *Hardin v. State* (1993), Ind., 611 N.E.2d 123, 128, we noted as follows:

> This rule generally allows the admission of extrinsic evidence and only excludes it where the uncharged misconduct is used for the sole purpose of suggesting to the

jury that the defendant possesses certain character traits and acted in conformity with those character traits in the present, charged crime.

*Koo, supra* at 101.

■ Thus, relying upon *U.S. v. McAnderson* (7th Cir.1990), 914 F.2d 934, and *U.S. v. Beltempo* (2nd Cir.1982) 675 F.2d 472, *cert. denied* 457 U.S. 1135, 102 S.Ct. 2963, 73 L.Ed.2d 1353, we determined that prior misconduct may be admitted to rebut a specific factual claim raised by the defense. *Koo, supra.* Accordingly, because Defendant introduced substantial evidence to suggest that Victim had hallucinated the sexual encounter, we found that the prosecution was entitled to rebut that claim with evidence of the Defendant's prior misconduct.

■ Here, Thornton presented substantial evidence suggesting that his degenerative physiological impotency made it impossible, or at the very least highly unlikely, for him to have engaged in sexual intercourse with his daughters. In fact, he specifically claimed that his erection problems made it impossible for him to have had sex with two people on October 26, 1991—the date J. and L. claimed he took them both to a Motel 6 and engaged in intercourse with both. (R. 956). Thus, the State was entitled to rebut Thornton's claim with Rollins' testimony concerning Thornton's "erection" comment noted above.

■ Likewise, when Thornton voluntarily claimed on cross-examination that he never touched any of his daughter's friends in a sexual manner,[3] the State was entitled to rebut that factual claim with Rollins' and Clifft's testimony concerning the prior acts of sexual misconduct which Thornton directed at them. Indeed, we know of no authority

---

**3.** We note Rollins and Clifft both testified during the State's case-in-chief. The State questioned each girl at length concerning Thornton's behavior with his daughters. The State did not ask any questions concerning Thornton's behavior toward Rollins and Clifft. Thornton voluntarily injected the issue of his behavior toward the girls while answering an unrelated question during cross-examination.

Thus, the argument advanced by Thornton in his Reply brief must fail. Specifically, Thornton cites *Highley v. State* (1989), Ind.App., 535 N.E.2d 1241, 1243, for the proposition that "[a] party may inquire into a collateral matter on cross-examination, but the questioner is then 'bound by the answer' received; the impeaching party cannot thereafter offer extrinsic evidence to disprove the answer unless the extrinsic evidence would be independently admissible." We remind Thornton that, in this case, the State did not inquire into his conduct with his daughter's friends. Therefore, *Highley* is inapplicable.

which allows a defendant to "open the door" and close it at his or her convenience.[4]

Nevertheless, as we noted in *Koo, supra* at 102, even if the evidence is admissible under Evid.R. 404(b) to rebut a specific factual claim raised by the defense, the evidence still must meet the test of Ind.Evidence Rule 403 which provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

▮ Here, Rollins' testimony with respect to the "erection" comment made to her by Thornton is highly probative of Thornton's sexual potency during the time his daughters lived with him, and the evidence concerning Thornton's behavior towards Rollins and Clifft is probative of Thornton's truthfulness.

Moreover, the probative value of the evidence of Thornton's prior acts of misconduct outweighs the danger of unfair prejudice since the evidence of Thornton's guilt of the charged crimes against his daughters is overwhelming. L., J., and C. testified as to the various acts Thornton performed upon each of them. Additionally, unlike many child molestation cases where there are no witnesses to the crime other than the victim, numerous people witnessed Thornton's actions with his daughters.

For example, L. testified she witnessed Thornton touch J. in the same places he touched her, (R. 422), and she heard Thornton have intercourse with J. (R. 431). L.

also saw Thornton have intercourse with J. at the Motel 6. (R. 440). J. testified that she saw Thornton grab C.'s "boobs and butt," (R. 508), and she saw Thornton have sex with L. at the Motel 6. (R. 522). J. saw Thornton grab L. (R. 784), and L. "jack him off." (R. 785).

Jamie Pittman, C.'s friend, observed Thornton fondle J.'s chest and grab her bottom. (R. 803). On one evening when Pittman was spending the night with C., the girls heard crying. Pittman went downstairs to investigate, and saw Thornton lying on top of J. in his bed. (R. 805). Pittman frequently observed Thornton kiss J. During the State's case-in-chief, Rollins testified that Thornton "was really touchy with them [his daughters], always wanting them to kiss him, sitting on his lap ... He was just real touchy and grabby with them." (R. 864-5). Clifft, who was C.'s friend, testified that she saw Thornton put his tongue in J.'s mouth. Clifft was also present the night Pittman spent the night with C. and saw Thornton on top of J. in his bed. Although she did not see Thornton on top of J., Clifft heard J. moaning and calling out "Daddy" from inside Thornton's bedroom. (R. 887-8).

Aside from the evidence of the charged crimes, any potential prejudice to Thornton was minimized by the following instruction:

> Rebuttal evidence has been introduced that the defendant was involved in crimes other than those charged in the information. This evidence has been received solely on the issue of the defendant's truthfulness. This evidence is to be considered

---

4. Thornton nevertheless directs our attention to *Fisher v. State* (1994), Ind.App., 641 N.E.2d 105, and urges us to vacate his conviction. In *Fisher*, Grandfather molested his granddaughter. On cross-examination, Fisher testified that he never molested his granddaughter, or any other child, at any time in his life. On rebuttal, the State called Fisher's daughter who testified that Fisher molested her twenty-three years earlier. The trial court instructed the jury that the rebuttal evidence was received and should be considered only on the issues of Fisher's intent or the absence of mistake.

On appeal, citing our supreme court's decision in *Wickizer v. State* (1993), Ind., 626 N.E.2d 795,

we found that the rebuttal evidence of Fisher's prior misconduct described incidents that were too remote in time to be considered genuinely relevant to prove Fisher's intent for the charged crime.

Here, however, not only is Thornton's intent to commit the charged crimes not the purpose for which the State sought to introduce the rebuttal evidence of Thornton's prior acts of sexual misconduct, the remoteness problem present in *Fisher* is not present in the facts before us. Indeed, the incidents about which Rollins and Clifft testified occurred during the same time period as the charged crimes.

by you only for the limited purpose for which it was received.

(R. 231).

Thus, because the rebuttal evidence of Thornton's prior misconduct was not introduced to prove Thornton's character in order to show that he acted in conformity therewith, we cannot say the trial court abused its discretion in allowing Rollins and Clifft to testify on rebuttal.

Affirmed.

RILEY and RUCKER, JJ., concur.