Michael GARDNER, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted: June 6, 1989.
Decided: Nov. 24, 1989.

Louis B. Ferrara (argued), Aerenson, Ferrara & Lyons, Wilmington, for appellant.

Richard E. Fairbanks, Jr. (argued), Chief of Appeals Div. and Timothy J. Donovan, Jr., Deputy Atty. Gen., Dept. of Justice, Wilmington, for appellee.

Before CHRISTIE, C.J., HORSEY, MOORE, WALSH and HOLLAND, JJ., constituting the Court en banc.

WALSH, Justice:

The appellant, Michael Gardner ("Gardner"), appeals from his conviction in the Superior Court on charges of trafficking in cocaine, possession of drug paraphernalia, maintaining a dwelling for keeping controlled substances and one count of possession of a deadly weapon during the commission of a felony. These charges arose out of the seizure of drugs and weapons at Gardner's residence near Newark on October 10, 1986. Gardner claims that the evidence seized at his home should have been suppressed because the search warrant was not supported by probable cause and not issued by a neutral magistrate. He also alleges error in an improper discovery response by the State and the lack of a sufficient nexus between the weapon seized and the underlying drug felony. We conclude that the search warrant was properly issued in this case and that there was no discovery violation by the State. We also conclude, however, that the State failed to establish the required evidentiary nexus between the weapon and the predicate felony. Accordingly, we affirm the conviction on the drug charges but reverse as to the weapon charge.

I

Gardner had been the subject of police interest and suspicion for several months preceding his arrest on October 10, 1986. In July, 1985, a controlled purchase of cocaine was made from Gardner's residence through a police informant. Police had earlier received information that drug sales were taking place at the Gardner residence, with drug shipments arriving from New York, usually on Thursdays and Fridays. In December, 1985, information received from Crime Stoppers, a telephone reporting service for public complaints of criminal activity, pointed to continued drug distribution from the residence. In September, 1986, a confidential informant reported to police that both Gardner and his wife, Wendy, were dealing in large quantities of drugs from their home.

The specific events that led to the seizure of drugs at Gardner's home on October 10 began with the arrest of David Levy ("Levy") on drug charges in April, 1986. Because of the seriousness of the charges against him, Levy agreed to become a police informant and assist in the arrest and conviction of individuals selling drugs. In exchange for his cooperation, Levy was promised a reduction in charges and a favorable sentencing recommendation. Levy agreed to participate in a controlled drug purchase from Gardner, but because Levy believed that Gardner might be aware of Levy's arrest and thus be suspicious of him, it was agreed that Levy would act as an indirect purchaser through an intermediary, or middleman. The direct purchase from Gardner was to be made by Edward Krolick ("Krolick"). Levy had been supplying drugs to Krolick, who also knew Gardner. Krolick, who had no knowledge of police involvement, thus became an unwitting informant.

Pursuant to the police-designed plan, Levy approached Krolick with the request that Krolick arrange to purchase a quarter pound of cocaine from Gardner at the latter's residence for $8,000. The plan called for a two-part transaction: Krolick would buy one ounce of cocaine for $2,000, advising Gardner that if the drugs were satisfactory to his purchaser, Krolick would return to complete the transaction. When Krolick delivered the initial drugs to Levy,

Krolick was to be arrested. Then the police would secure a search warrant to seize the remaining drugs and arrest Gardner.

Although Krolick was told he would receive $300 and $1,000 worth of cocaine for acting as the middleman, he was reluctant to participate, primarily because he would be twice exposed to the danger of arrest. In order to eliminate the sampling phase of the deal, Krolick visited Levy the day before the proposed transaction to deliver a small quantity of cocaine which, Krolick claimed, came from Gardner. Levy insisted, however, that the deal proceed as planned the next day.

On the morning of October 10, 1986, Levy met Krolick outside of Wilmington. Levy had been fitted with a body wireless transmitter that permitted the police to monitor his conversations. Levy suggested to Krolick that they meet again at a shopping center outside Newark, closer to Gardner's house. Under constant surveillance by the police, who were also watching Gardner's residence, Levy and Krolick proceeded in separate vehicles to the University Plaza Shopping Center. At the shopping center Levy gave Krolick $2,000 for the initial purchase. Krolick again expressed reluctance at the two-part transaction and requested the entire $8,000 for a single deal. Levy, who had only the $2,000 supplied him by the police, insisted on the original plan. Krolick then drove to Gardner's house, arriving near noon. After knocking and receiving no response, he left to rejoin Levy at the shopping center. Krolick's actions were observed by surveilling police. Krolick and Levy then had lunch while waiting for Gardner's return.

Krolick returned to Gardner's residence near 1:00 p.m., knocked and on this occasion was admitted. He emerged from Gardner's house a few minutes later and proceeded to rendezvous with Levy. Police officers, monitoring the conversation, heard Levy ask Krolick if he had the drugs and when Krolick replied in the affirmative, the police immediately moved in and arrested Krolick. When Krolick was searched, however, the police found the initial $2,000 but no drugs. Krolick refused to answer any questions and demanded a lawyer.[1]

After Krolick had been taken into custody, the police officers who were conducting a surveillance of the Gardner residence observed Gardner pacing back and forth in front of the house. The police assumed that Gardner was waiting for Krolick's return to complete the transaction—a scenario that seemed reasonable in view of Krolick's reluctance to do a two-part transaction and the fact that he obviously had not carried out the initial purchase since he still had the $2,000 on his person when arrested. The police decided to act quickly since they feared that Gardner would not wait for an extended period of time for Krolick's return.

In view of the pace at which events were developing, Detective Pulling, the officer in charge of the operation, decided to arrest Gardner immediately and then secure a search warrant to search the residence. Pulling first telephoned a Justice of the Peace and related the history of drug activity at Gardner's residence and the events that had taken place that day. Pulling was advised by the Justice of the Peace that probable cause existed for a search war-

---

1. Krolick described his conversation with Levy as follows:

Q. Tell the jury in detail what you recall doing and the conversation that ensued when you met Levy back at the University Plaza.

A. Okay. I went back to talk to Frank and trying to figure a way to explain it to him that I couldn't do this for him. And I'm sitting, driving over there, and what came to my head was, do it like good news and bad news type thing. The good news is the stuff is there, Frank; the bad news is, you have to get somebody else to get it.

I got part of that out, and Frank had to get gas in my truck. It was running right on "E". And I tried to get Frank to get in the truck, and he kept asking, "Do you have it? Do you have it?" And I shook my head yeah, and I said, "Yeah." And that's when I got arrested.

Q. Did you have the opportunity to say anything else to Frank Levy?

A. No. Just good news, the stuff's there, and I said—he asked me, "Do you got it?" And I said, "Yeah." I didn't get to finish my sentence.

rant[2] and another officer proceeded to complete a written application for a search warrant. The affidavit to the application had already been partially drafted to include the background of the drug activity at Gardner's residence. Pulling also ordered Gardner's immediate arrest by a special SWAT team that had been stationed nearby. The presence of the SWAT team on standby status was occasioned by information that Gardner might have an array of weapons in the residence. Gardner was promptly arrested outside his residence and kept under guard inside the house, which was also subjected to a security search for the presence of weapons. Three officers remained in the residence with Gardner, who had been given his *Miranda* rights, to await the arrival of the search warrant. Although Gardner had been searched incident to his arrest, no particularized search of the residence occurred prior to the execution of the search warrant. When the search warrant had been signed by the Justice of the Peace, that fact was communicated by telephone to the officers at Gardner's residence. One of the detaining officers then asked Gardner if there were any drugs in the residence. Gardner pointed to a bag hanging on a stair railing. The bag was seized and found to contain over three ounces of cocaine. A full search of the house ultimately revealed a revolver in the top drawer of a night stand in the master bedroom, other firearms on the second floor, and scales and drug paraphernalia in the basement.

Prior to trial, Gardner moved to suppress the seizure of the drugs and guns on the grounds that his warrantless arrest was unjustified by exigent circumstances and that the subsequent search of his residence was based on a search warrant that issued without probable cause. The trial court denied suppression and Gardner was subsequently convicted of both the drug and weapon offenses. On appeal Gardner renews his attack on the legality of the arrest and search. He also complains of the alleged failure by the State to provide adequate discovery and the lack of a sufficient evidential nexus between the drug convictions and the weapon charge.

## II

Gardner's appeal from the suppression ruling is three-pronged. First, he contends that his arrest outside the residence was unsupported by probable cause or exigent circumstances. He also argues that the affidavit executed by police in support of the search warrant application lacked sufficient corroborated facts to justify the issuance of the warrant. Finally, Gardner asserts that the Justice of the Peace, in orally approving the police recital of the facts underlying the affidavit, abandoned his role as a detached and neutral magistrate and the search warrant thus issued without an objective determination that it was justified.

Theoretically, Gardner's motion to suppress is directed against two distinct areas of police conduct, the warrantless arrest and the warrant-authorized search of the premises. Nevertheless, the factual basis for the claim is essentially the same. The events that the police viewed as establishing probable cause for the securing of a search warrant, the history of drug dealing at Gardner's residence, and the circumstances of Krolick's arrest were all considered by the police to support their decision to arrest Gardner while he was pacing outside his residence. Gardner argues that the evidence of past drug dealing was based on unreliable or stale information and that when viewed in light of the unsuccessful efforts of the unwitting informant, the evidence provides no basis for a finding that probable cause existed. To the contrary, the State contends that upon Krolick's arrest the police had the necessary verification to justify their belief that drugs were at the Gardner residence. That evidence was sufficient, the argument runs, both to secure a search warrant and immediately to arrest Gardner to prevent him from destroying the drugs or gaining access to weapons believed to be in the residence.

---

2. Pulling testified that "the magistrate told me no problem whatsoever, let's go with it."

The authority for a warrantless arrest is statutorily defined under Delaware law. 11 *Del.C.* § 1904 permits a peace officer to arrest without a warrant for a felony whenever "he has reasonable ground to believe that the person to be arrested has committed a felony, whether or not a felony has in fact been committed." The term "reasonable ground" has been deemed the evidentiary equivalent of "probable cause." *Thomas v. State*, Del.Supr., 467 A.2d 954 (1983). Thus, in this case the legal standard for the securing of the search warrant and the warrantless arrest are the same. *Coleman v. State*, Del.Supr., 562 A.2d 1171, 1177 (1989); *Thompson v. State*, Del.Supr., 539 A.2d 1052, 1055 (1988). Moreover, the prospect that Gardner would have access to weapons if allowed to enter his residence added an element of exigency to his warrantless arrest. In any event, Gardner rests his claim in both areas on the asserted lack of probable cause.

In *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the United States Supreme Court rejected the previously established two-faceted test of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) (affidavit must establish (1) the informant's basis of knowledge or (2) provide sufficient facts to establish either the informant's veracity or the reliability of the informant's report) in favor of a "totality of the circumstances" standard for the issuance of search warrants. The Court viewed the rule from the perspective of the magistrate or judge presented with a request for a search warrant:

> The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed. *Jones v. United States*, 362 U.S., [257] at 271, 80 S.Ct., [725] at 736 [4 L.Ed.2d 697]. We are convinced that this flexible, easily applied standard will better achieve the accommodation of public and private interests that the Fourth Amendment requires than does the approach that has developed from *Aguilar* and *Spinelli*.

462 U.S. at 238–39, 103 S.Ct. at 2332–33. The Court also noted that a totality of circumstances approach is not only more consistent with prior decisional treatment of the concept of probable cause but also a more "practical, nontechnical" concept. *Id.* at 231, 103 S.Ct. at 2328. In particular the Court emphasized that the "assessment of probabilities" that flows from the evidence presented in support of the warrant "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Id.* at 232, 103 S.Ct. at 2329 (quoting from *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)).

This Court has also eschewed a hypertechnical approach to the evaluation of the search warrant affidavit in favor of a common-sense interpretation, bearing in mind that the court reviewing the search warrant owes a certain degree of deference to the issuing magistrate. *Tatman v. State*, Del.Supr., 494 A.2d 1249, 1251–52 (1985); *Jensen v. State*, Del.Supr., 482 A.2d 105, 111 (1984). While this Court has had no specific occasion to apply the totality of circumstances standard announced in *Gates*, we recognize its compelling force and find it consistent with our holding in *Jensen* that the affidavit supporting the search warrant must be "considered as a whole and not on the basis of separate allegations." *Id.* at 111.

When viewed from a totality of the circumstances perspective, the search warrant affidavit clearly contained, within its "four corners," information from which one could conclude that it was more than merely probable that Gardner had been engaged in drug transactions at his residence and that drugs were likely to be on

the premises on October 10, 1986. The affidavit recites a two-year history of drug dealing at the Gardner residence, including evidence of a direct controlled buy and various reports from police officers and anonymous sources. Although the most recent report of drug activity at the residence, prior to the Krolick–Levy transaction, occurred in December, 1985, Gardner continued to occupy the residence in the interim and by September of 1986, Levy, then an informant, had confirmed the continuance of drug dealing.

Gardner contends that the failure of Krolick, the unwitting informant, to purchase drugs as planned, renders his participation in the plan not credible and thus not corroborative of the presence of drugs at the residence. While it is true that the plan went awry because of Krolick's failure to participate in a two-part drug purchase, his statement, overheard by police, that the drugs were present on the premises was consistent with the police design to arrest Krolick after he had completed the first part of the transaction. It was only after Krolick was arrested and the $2,000 purchase money was found on his person that the police had reason to doubt his basis for believing that drugs were on the premises. At that time, however, the police were aware that Gardner appeared to be waiting for Krolick's return, which suggested that Gardner understood that a second or completed transaction would occur upon Krolick's return. In view of the long history of drug activity at the Gardner residence, including the information that drugs were usually received by Gardner on Thursdays or Fridays (October 10 was a Friday) the truncated events of October 10 were important only insofar as they verified the presence of drugs on the premises on that date. The aborted participation of Krolick, including his statements before arrest, coupled with Gardner's appearance of continued involvement in completing the drug sale, provided the necessary elements, under a totality of circumstances analysis, to establish *probable* cause for the issuance of the *search* warrant and Gardner's warrantless arrest.

■ In addition to being supported by probable cause, the immediate arrest of Gardner was also justified by exigent circumstances. The reasonable belief that guns and drugs were present in the residence suggested not only that evidence might be destroyed but also that the safety of the police might be endangered if Gardner were permitted to enter the residence while the police awaited the arrival of the search warrant. While the State has the burden of proving exigency, "the criterion is the reasonableness of the belief of the police as to the existence of an emergency, not the existence of an emergency in fact." *Patrick v. State*, Del.Supr., 227 A.2d 486, 489 (1967). It does not appear that Gardner's arrest was a pretext to gain access to the residence in order to conduct a warrantless search. There is no indication that Gardner's arrest or the subsequent security sweep of his residence resulted in the discovery of any drugs. It was only after the officers detaining Gardner were informed that the search warrant had been issued that the drugs were found.

■ Gardner argues that the information in the affidavit detailing the two-year history of drug activity at Gardner's residence is stale since there was a hiatus between the December, 1985 anonymous tip and the October 10 transaction. This Court has held that where staleness is alleged, "the test of temporal proximity is determined on an *ad hoc* basis in the light of circumstances of each case." *Jensen v. State*, 482 A.2d at 111. Where the evidence sought to be seized is subject to deterioration or change because of the passage of time or where contact between the evidence sought to be seized and the defendant is remote, historical information in the search warrant may be viewed as not establishing a current probability. Time is a critical element because probable cause must be based on current information. *Pierson v. State*, Del.Supr., 338 A.2d 571, 573 (1975). Here, however, the location of the alleged drug activity never changed during the two-year period of suspicion. Moreover, the police established through the check of public utility records that Gardner continued to occupy the premises

at the time the Krolick–Levy plan was arranged. Finally, the continuing regularity of drug shipments to Gardner, together with Gardner's presence at his residence on October 10, demonstrates the probability that his drug activity persisted through the date of the search warrant application. We find no merit in the staleness argument.

We next address Gardner's contention that the Justice of the Peace who issued the search warrant abandoned his role as a neutral and detached magistrate by discussing the basis for the search warrant with Detective Pulling prior to the presentation of the written affidavit. Gardner contends that the magistrate's discussion with the police officer and his comment "Let's go with it" indicate a lack of impartiality that vitiates the warrant.

 The requirement that a judicial officer to whom an application for a search warrant is presented assume an impartial role is essential to the maintenance of the constitutional protection against unreasonable searches. *United States v. Leon*, 468 U.S. 897, 914, 104 S.Ct. 3405, 3416, 82 L.Ed.2d 677 (1984); *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). While it may be necessary for police officers seeking to secure a warrant to initiate contact with a judge or magistrate to determine the latter's availability to receive the written application required by 11 *Del.C.* § 2306, the knowledge of the issuing judge must be limited to facts contained within the affidavit. *Pierson v. State*, 338 A.2d at 573. Thus, we do not condone informal discussions between the police and a judge or magistrate in connection with the issuance of search warrants, except to the extent that they may be necessary for logistical purposes. Not only do such discussions create the risk that the magistrate will become privy to extraneous information, but they also cast doubt on the detachment of a judicial officer. A judge may not treat the search warrant process as a collaborative effort between the judiciary and the police. While a search warrant application is, of necessity, an *ex parte* proceeding, it is nonetheless a judicial proceeding. The judge or magistrate must maintain his impartiality and not ally himself with one party.

 Notwithstanding our disapproval of the informality evident in the magistrate's discussion with Detective Pulling in this case, we do not believe that this lapse affected the underlying validity of the search warrant. The test for determining the establishment of probable cause is applied when the evidence seized under the warrant is subject to a motion to suppress. At that time, "sufficient facts must appear on the face of the affidavit so that a magistrate's personal knowledge notwithstanding, a reviewing Court can verify the existence of probable cause." *Pierson v. State*, 338 A.2d at 573. Thus, if the affidavit, within its four corners, establishes probable cause for the issuance of a search warrant to the satisfaction of the Superior Court and of this Court on review, the subjective beliefs or attitude of the issuing magistrate will not invalidate the warrant. Since we have previously concluded that the information presented in the written affidavit, when viewed under a totality of circumstances test, established probable cause for the issuance of the search warrant, the magistrate's prior involvement is not fatal to the search warrant.[3]

### III

Gardner's next claim of error is directed to the trial court's refusal to suppress, or alternatively, grant a mistrial because the existence of a secretly-recorded taped statement of Gardner had not been disclosed prior to trial. The trial judge permitted the State to offer this evidence on the ground that it had not been obtained by a State agent nor was it otherwise discoverable before trial.

---

**3.** Our ruling validating the search warrant under a totality of circumstances test renders unnecessary consideration of the State's alternative argument, premised upon *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), that evidence seized by the police in justifiable reliance upon a technically defective search warrant is admissible. Accordingly, we express no opinion upon that question.

Krolick, the unwitting informant, had been indicted as a co-defendant with Gardner. On the first day of trial, Krolick entered a guilty plea on charges of conspiracy and drug possession and agreed to testify on behalf of the State. After the entry of this guilty plea, the State learned for the first time that Krolick, on the advice of his counsel, had surreptitiously recorded certain conversations with Gardner during the period between arrest and trial. Gardner's statements were incriminating and the State proposed to use them at trial. When the tapes were turned over to the prosecutor, he immediately notified Gardner's counsel of their existence and made them available for listening. After hearing the tapes, Gardner's counsel promptly moved for their suppression.

■■■ Gardner contends that the State failed to comply with Superior Court Criminal Rule 16 (which requires, *inter alia,* disclosure of pretrial statements made by a defendant) by not making a diligent effort to determine whether such incriminating evidence existed. We agree with the State, however, that Rule 16(a)(1) requires disclosure and production of a defendant's statement only if it is (1) made in response to interrogation by a person known to the defendant to be a state agent and (2) known to be within the possession, custody or control of the State.[4] Gardner concedes that at the time Krolick made the tape recordings, he was not an agent of the State. Even if, arguably, he might be deemed a State agent upon agreement to testify as a State's witness, the obligation to produce the statement arose only when the State became aware of its existence. There is no contention that the State did not act promptly in advising Gardner's counsel of the tapes and offer access to them. Clearly, there was no lack of good faith on the part of the State in complying with its discovery obligation under Rule 16.

■■■ Gardner also argues that he was entitled to production of the tapes as *Jencks* material. *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). While it is questionable whether statements made to non-state agents are subject to *Jencks* production, *Hooks v. State,* Del.Supr., 416 A.2d 189, 200 (1980), the duty to provide a witness' statement does not arise until the witness is tendered for cross-examination. *Id.* at 200. Moreover, there is no requirement that *Jencks* material be identified in the pretrial discovery under Rule 16. *Rose v. State,* Del. Supr., 542 A.2d 1196, 1198–99 (1988).

We find no error in the trial court's refusal to suppress Gardner's taped statement to Krolick nor in its refusal to grant a mistrial.

## IV

At the time of Gardner's arrest and the execution of the search warrant, police discovered several weapons in various locations in Gardner's residence: the garage, an attic hallway and in Gardner's bedroom. He was subsequently indicted on three separate counts of possession of a deadly weapon during the commission of a felony (trafficking in cocaine) for three weapons found in his bedroom: a revolver located in a drawer of a night stand and a rifle and shotgun found elsewhere in the room. The jury convicted Gardner of the weapons offense involving the revolver found in the night stand but were unable to reach a unanimous verdict as to the remaining weapons charges. Gardner now contends that the evidence was insufficient to establish that the weapon found in the night stand was "possessed" by him while com-

---

4. **RULE 16. DISCOVERY AND INSPECTION**
 (a) **Defendant's Statements; Reports of Examinations and Tests; Defendant's Grand Jury Testimony.** The defendant may serve upon the Attorney General a request to permit the defendant or someone acting in his behalf to inspect and copy or photograph any relevant (1) written or recorded statements or confessions made by the defendant, or a co-defendant (whether or not charged as a prin-

cipal, accomplice or accessory in the same or in a separate proceeding), or copies thereof, and the substance of any oral statement which the State intends to offer in evidence at the trial made by the defendant whether before or after arrest in response to interrogation by any person then known to the defendant to be a state agent which are known by the Attorney General to be within the possession, custody or control of the State.

mitting the offense of trafficking in cocaine.

In order to secure a conviction for possession of a deadly weapon during the commission of a felony as proscribed by 11 *Del.C.* § 1447,[5] the State is required to establish that at the time he was engaged in the designated predicate felony the defendant had a deadly weapon "physically available or accessible to him." . *Mack v. State*, Del.Supr., 312 A.2d 319, 322 (1973). In *Mack*, a weapons conviction was upheld where the evidence indicated that a loaded gun was found in the defendant's bedroom, where drugs and paraphernalia were also found. In *Wilson v. State*, Del.Supr., 343 A.2d 613 (1975), this Court sustained a weapon possession charge where a loaded rifle and handgun were found less than 25 feet from the place where the narcotic drugs were discovered. By contrast, we find that the evidence in this case clearly failed to establish the required nexus between the underlying felony and the location of the weapon.

Although Gardner was arrested outside his residence, it may be assumed, based on the jury's verdict on the trafficking count, that there was sufficient evidence to establish, beyond a reasonable doubt, that Gardner's dealings with Krolick on October 10 constituted trafficking in cocaine.[6] The only evidence of what transpired between Krolick and Gardner inside the Gardner residence was elicited from Krolick's testimony at trial. Krolick testified that he went inside, held a discussion with Gardner, took money from his pocket to purchase drugs but then decided to back out of the transaction. He then returned to Levy and was arrested. When police later searched the Gardner residence, they found drugs in a bag near a stairway in the living room and drug paraphernalia in the basement but no drugs or paraphernalia in the bedroom where the weapons were seized.

The State argues that since there was evidence that drugs had probably arrived at the Gardner residence the previous day, and Krolick had secured a sample of cocaine the previous day, Gardner's possession of drugs was continuous and the revolver was thus accessible to him during this continuum. While such evidence may be sufficient to support probable cause in a search warrant application, it is significantly short of the quantum necessary to sustain a conviction under the "physically available and accessible" test of *Mack*. There is no evidence that the drugs seized were ever in the bedroom or that the bedroom was the scene of drug trafficking. To the extent that the drug trafficking may be said to have a *locus*, it may be argued that the entire residence was the location of that felony. Nevertheless, it could not credibly be contended that weapons found anywhere in the Gardner residence could form the basis for a charge under section 1447. Indeed, the State's failure to pursue an indictment for weapons found outside the bedroom is a tacit concession that the trafficking was not co-extensive with the entire residence.

The clear legislative policy supporting the enactment of section 1447 is "to discourage the *accessibility* of a deadly weapon during the commission of a crime, thus reducing the probability of serious harm to the victim." *Mack v. State*, 312 A.2d at 322 (emphasis in original). We recognize that in the context of illegal drug activity, that policy may be extended to include the protection of persons involuntarily exposed to drug activity, particularly police officers. But the automatic compounding of drug felonies through the use of section 1447 charges whenever a weapon is found in the general vicinity of a defendant charged

5. **§ 1447. Possession of a deadly weapon during commission of a felony; class B felony.**
 (a) A person who is in possession of a deadly weapon during the commission of a felony is guilty of possession of a deadly weapon during commission of a felony.
 Possession of a deadly weapon during commission of a felony is a class B felony.

6. Gardner was also convicted of the felony of maintaining a dwelling for the keeping of narcotic drugs in violation of 16 *Del.C.* § 4755(a)(5). The State, however, did not charge him with possessing a weapon during the commission of that felony.

with a drug-related felony is illogical and, as a matter of fundamental fairness, indefensible. There is no suggestion in this case that the safety of the arresting officers was ever at risk by the presence of any guns in the residence once Gardner had been placed in custody outside that residence. Indeed, with Gardner securely in custody, handcuffed and taken into the residence where he was seated in the living room, it is indisputable that any weapon in the bedroom was not physically accessible to him.

We conclude that the required evidentiary nexus of physical accessibility between the weapon and Gardner's engaging in the underlying felony of drug trafficking is insufficient as a matter of law. Accordingly, his conviction on the charge of possession of a deadly weapon during the commission of a felony must be reversed.

In summary, we AFFIRM the defendant's conviction on all charges except the charge of possession of a deadly weapon during the commission of a felony. As to that charge we REVERSE.