**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| **STATE OF DELAWARE** | ) | |
| | ) | |
| **v.** | ) | **I.D. No. 2308003580** |
| | ) | |
| **DAYQUANE BARNES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

Date Submitted: November 21. 2024
Date Decided: January 29, 2025

*Upon Defendant's Motion to File Out of Time and to Suppress Evidence*
***DENIED***[1]

Ipek Kurul, Esquire, Alexandra L. LeRoy, Esquire, Delaware Department of Justice, Wilmington, Delaware, *Attorneys for the State*.

Eugene J. Maurer, Jr., Esquire, Molly R. Dugan, Esquire, Wilmington, Delaware, *Attorneys for Dayquane Barnes*.

**DAVIS, J.**

## I.     INTRODUCTION

This is a criminal action.  On August 14, 2023, the State of Delaware obtained an indictment against Defendant Dayquane Barnes charging him with (i) four counts of Possession of a Firearm During the Commission of a Felony ("PFDCF"); (ii) Murder First Degree; (iii) Burglary First Degree; (iv) Reckless Endangering First Degree; (v) Wearing a Disguise During the Commission of a Felony; and (vi) two counts of Possession of a Firearm by a Person Prohibited ("PFBPP").

Mr. Barnes has filed a motion to suppress (the "Motion")[2] evidence seized during a

---

[1] The Court granted that part of the Motion seeking to file out of time.  The Court held a hearing on the Motion on November 21, 2024.
[2] D.I. No. 35.  The Motion will be referred to as "Mot. at ___."

search of his apartment authorized by a search warrant (the "Residence Warrant").[3] Mr. Barnes argues that the information contained in the Affidavit and Application (the "Affidavit") presenting facts to establish probable cause to search his residence was stale and therefore renders the Residence Warrant invalid. The State opposed the Motion.

On November 21, 2024, the Court held a hearing on the Motion. Counsel for the parties did an outstanding job arguing their positions on the Motion. In order to properly address these arguments, the Court took the Motion under advisement at the conclusion of the hearing. For the reasons set forth below, the Motion is **DENIED**.

## II.     RELEVANT FACTS[4]

### A. THE MURDER AND ON-SCENE INVESTIGATION

On December 1, 2022, around 2:00 p.m., officers from the Wilmington Police Department ("WPD") responded to a welfare check at 1007 North Madison Street, Wilmington, Delaware (the "Apartment Building").[5] When they arrived, WPD learned that a man had been shot in the first-floor apartment.[6] The man was later identified as Lerrie Tate, and he ultimately died from his injuries.[7]

WPD found one nine-millimeter shell casing in the bedroom where Lerrie Tate's body was located.[8] WPD also spoke to an on-scene witness who provided that they saw the shooting and described the shooter to be a black male wearing a black ski mask and a black sweatshirt

---

[3] *See* Mot. at 12. Mr. Barnes also challenges the validity of the search warrant for his cell phone; however, the State will not be presenting evidence obtained from Mr. Barnes' iPhone in its case-in-chief. Therefore, this issue is moot and will not be addressed in this Opinion.
[4] Unless otherwise indicated, the facts are taken from the Affidavit and Application attached to the Residence Warrant. Mot., Ex. A. The Affidavit and Application will be referred to as "Aff at ¶ __."
[5] Aff. at ¶ 3.
[6] *Id.*
[7] *See* Mot. at 2.
[8] Aff. at ¶ 4.

with some writing on it.[9]  The witness stated that the firearm used was black in color.[10]  The witness also stated that they believed the shooter was the man who lived on the second floor of the Apartment Building.[11]

WPD located a mask and black sweatshirt with yellow and green writing on the sidewalk around the corner from the Apartment Building in the 700 block of W. 10th Street.[12]  WPD also collected surveillance footage from the buildings in the area.[13]  The surveillance footage shows a man wearing a black sweatshirt with yellow and green writing running out of the Apartment Building.[14]  The man ran south on N. Madison Street and turned right into the 700 block of W. 10th Street where the black sweatshirt and black mask were located by WPD.[15]

Another witness stated they saw a muscular black male remove the sweatshirt and mask from his person and leave it on the sidewalk.[16]  The witness said they saw the man run through an alleyway down Madison Street.[17]  WPD confirmed that the Madison Street alleyway provided access to the rear of the Apartment Building, and a fire escape provided access to the rear windows of Apartment C on the second floor, which is where the suspect was believed to reside ("Apartment C").[18]

WPD also accessed surveillance footage from before the shooting.[19]  This surveillance footage shows a man wearing the same clothing get out of a red Lexus and enter the Apartment

---

[9] Aff. at ¶ 5.
[10] Id.
[11] Id.
[12] Aff. at ¶ 6.
[13] Aff. at ¶¶ 6 and 7.
[14] Id.
[15] Aff. at ¶ 7.
[16] Aff. at ¶ 18.
[17] Id.
[18] Id.
[19] Aff. at ¶ 8.

3

Building.[20]  The Lexus then leaves.[21]  Prior to the homicide, the Lexus returns and the man wearing the same clothing gets out of the car and walks towards the Apartment Building.[22]

## B.  THE SUBSEQUENT INVESTIGATION

On December 29, 2022, WPD sent the black sweatshirt and mask for DNA testing.[23]  The results of the DNA testing came back on June 13, 2023.[24]  The DNA taken from the mask was preliminarily traced to Mr. Barnes.[25]

With this information, WPD contacted the Apartment Building's rental company and confirmed that Mr. Barnes still lived in Apartment C.[26]  In addition, WPD conducted a search of records from Delaware Division of Motor Vehicle ("DMV").[27]  This search confirmed that a red Lexus is registered to Mr. Barnes at Apartment C.[28]  The VIN for the Lexus is identified as JTHSM5BC3G5001737.[29]

WPD discovered that DMV issued a temporary registration to Mr. Barnes for the Lexus on December 1, 2022.[30]  WPD then contacted DMV to review any video surveillance from December 1, 2022.[31]  WPD reviewed footage from the DMV from that day and observed Mr. Barnes wearing the same clothes as the suspect seen running from the Apartment Building.[32]

WPD did an additional review of body-worn camera and surveillance footage from December 1, 2022.[33]  WPD determined that Mr. Barnes exited the Apartment Building after the

---

[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] Aff. at ¶ 10.
[24] Aff. at ¶ 11.
[25] *Id.*
[26] Aff. at ¶ 12.
[27] Aff. at ¶ 14.
[28] *Id.*
[29] *Id.*
[30] Aff. at ¶ 14.
[31] Aff. at ¶ 15.
[32] Aff. at ¶ 16.
[33] Aff. at ¶ 17.

shooting wearing different clothes: blue jeans, a black "Nike" long-sleeved shirt, and gray sneakers.[34] Mr. Barnes is also seen carrying a set of keys and getting into a red Lexus.[35]

WPD also determined that Mr. Barnes is a person prohibited from owning or possessing weapons due to a previous felony conviction in Maryland.[36]

On August 7, 2023, eight months after the murder occurred and two months after the DNA results came back, the police authored a search warrant for Mr. Barnes' residence (the "Residence Warrant").[37]

## III.    PARTIES' CONTENTIONS

### A. MR. BARNES

Mr. Barnes argues "[a]ny facts in the [Affidavit] which could have provided probable cause to search [Mr. Barnes'] apartment became stale before the warrant was obtained."[38] Mr. Barnes maintains that "the police were aware of the witness's statement that the shooter lived on the second floor of [the Apartment Building] the very day of the shooting."[39] Mr. Barnes also contends that WPD was aware of the suspect's physical description, vehicle, and clothing for eight months before the warrant was obtained.[40]

Mr. Barnes argues that, because the Affidavit is stale, the Residence Warrant is invalid.[41] As such, he claims his rights under the United States Constitution, Delaware Constitution, and 11 *Del. C.* §§ 2306-07 were violated, and the fruits of the search should be suppressed.[42]

---

[34] *Id.*
[35] *Id.*
[36] *See* Mot. at 5.
[37] *See id.*
[38] Mot. at 5-6.
[39] *Id.*
[40] *See id.*
[41] *See id.* at 13.
[42] *See id.*

5

## B. THE STATE

In the State's Response to Motion to Suppress (the "Response"),[43] the State contends that despite the witness's belief that the shooter lived at Apartment C, WPD waited to confirm the shooter's identity through DNA analysis, which took until June 13, 2023.[44] The State also asserts that once those results came back, WPD wanted to further identify whether Mr. Barnes still lived at Apartment C and drove the red Lexus, which took until August 7, 2023.[45] For these reasons, the State believes that the eight-month delay was permissible.[46]

Further, the State asserts the items the police were searching for are not likely to be "consumed, deteriorated or be removed because of indiscriminate access" since the items are "not incriminating in themselves and normally found in one's home."[47] If the Court finds that the firearm is removable or disposable, the State argues in the alternative that "[t]he police would have written a search warrant and seized the firearm inevitably considering [Mr. Barnes] was a person prohibited from owning and possessing firearms at the time the police executed the search warrant in his apartment."[48]

## IV. STANDARD OF REVIEW

Both the United States and Delaware Constitutions provide that a search warrant may be issued only upon a showing of probable cause.[49] To satisfy the probable cause requirement, a warrant application must contain:

> sufficient facts—viewed under the totality of the circumstances—to allow a neutral magistrate to conclude that there is a "fair probability" both that a crime has been committed and that evidence of that crime will be found in the particular place

---

[43] D.I. No. 39. The State's Response to Motion to Suppress will be referred to as "Resp. at __."
[44] Resp. at 9.
[45] *See id.* at 5.
[46] *See id.* at 9.
[47] *Id.* at 10.
[48] *Id.* at 10-11.
[49] *See* U.S. Const. amend. IV; Del. Const. art. I, § 6.

identified in the warrant.[50]

"Probable cause is established when a nexus between the items to be sought and the place to be searched appears."[51]  The warrant must authorize a search no broader than the probable cause on which the warrant is based.[52]

The Delaware constitutional requirements for search warrants are codified in 11 *Del. C.* §§ 2306 and 2307.[53]  Section 2306 provides that an application for a search warrant must "state that the complainant suspects that such persons or things are concealed in the house, place, conveyance or person designated [in the search warrant application] and shall recite the facts upon which suspicion is founded."[54]  Section 2307(a) provides that "the warrant shall designate the house, place, conveyance or person to be searched, and shall describe the things or persons sought as particularly as possible."[55]

"On a motion to suppress challenging the validity of a search warrant, the defendant bears the burden of establishing that the challenged search or seizure was unlawful."[56]

## V.     DISCUSSION

### A.  RULES REGARDING TIMING ON WARRANTS.

"The law is well settled that probable cause to justify the issuance of a warrant must be manifest at the time the warrant is sought to make the search."[57]  "Probable cause must be current and not rest on facts which existed in the past, unless there is reason to believe those facts are still in existence."[58]  "Whether information has become stale due to an impermissible delay

---

[50] *Terreros v. State*, 312 A.3d 651, 661-62 (Del. 2024).
[51] *Hooks v. State*, 416 A.2d 189, 203 (Del. 1980).
[52] *Buckham v. State*, 185 A.3d 1, 18 (Del. 2018).
[53] *State v. Sisson*, 883 A.2d 868, 875 (Del. Super. 2005).
[54] *Id*.
[55] *Wheeler v. State*, 135 A.2d 282, 295 (citing 11 *Del. C.* § 2307(a)).
[56] *Sisson*, 883 A.2d at 875.
[57] *Jensen v. State*, 482 A.2d 105, 111 (Del. 1984) (citing *Sgro v. United States*, 287 U.S. 206, 210-11 (1932)).
[58] *U.S. v. Beltempo*, 675 F.2d 472, 477 (2nd Cir. 1982).

in securing a warrant depends upon all the facts as viewed in a flexible and practical manner."[59]

The "vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts relied upon and the issuing of the affidavit."[60] "The question of the staleness of probable cause rests primarily upon the nature of the criminal activity alleged in the affirmation accompanying the warrant."[61] "Where the activity is of a continuing nature, a greater time lapse is justified than where the offense is an isolated one."[62] "Other factors to be considered include the kind of property for which authority to search is sought and whether such evidence is highly incriminating or consumable and thus less likely to remain in one location."[63]

Even if information has grown stale for purposes of demonstrating probable cause, more recent events recounted in the warrant and affidavit of probable cause may serve to refresh the earlier information.[64] "Where recent information corroborates otherwise stale information, probable cause may be found."[65]

## B. THE PROBABLE CAUSE FOR THE RESIDENCE WARRANT WAS NOT STALE

The Court finds that from the four corners of the Affidavit, WPD had probable cause to believe that Apartment C had evidence relating to Lerrie Tate's homicide. At the hearing, counsel for Mr. Barnes and the State focused, for the most part, on the eight-month delay between the homicide and the issuance of the Residence Warrant. As discussed below, the Court

---

[59] *Jensen*, 482 A.2d at 112.
[60] *State v. Pulgini*, 374 A.2d 822, 823 (Del. 1977) (citing *United States v. Johnson*, 461 F.2d 285, 287 (10th Cir. 1972)).
[61] *Jensen*, 482 A.2d at 111.
[62] *Beltempo*, 675 F.2d at 477.
[63] *Jensen*, 482 A.2d at 112.
[64] *U.S. v. Cantu*, 405 F.3d 1173, 1778 (10th Cir. 2005).
[65] *Emery v. Holmes*, 824 F.2d 143, 149 (1st Cir. 1987); *see also U.S. v. Henson*, 848 F.2d 1374, 1381 (6th Cir. 1988)(even assuming the information was "stale," that will not prevent a finding of probable cause if new information refreshes the "stale" information).

finds that the Affidavit does not wholly rely upon information obtained on December 1, 2022. Instead, the Affidavit provides additional information, acquired on and after June 13, 2023, that provides a basis for a finding of probable cause. This new information corroborated and supplemented the December 1, 2022 information—i.e., the new facts "refreshed" the December 1, 2022 facts. As such, the Court finds the Residence Warrant to be valid.

1. ***Lerrie Tate's homicide was an isolated incident that occurred eight months before issuance of the Residence Warrant, however, new information refreshed the older information justifying the delay.***

"Where the affidavit recites a mere isolated violation, it would not be unreasonable to imply that probable cause dwindles rather quickly with the passage of time."[66] "However, where the affidavit properly recites facts indicating activity of a protracted and continuous nature . . . the passage of time becomes less significant."[67] In addition, when new information corroborates otherwise stale information, the judicial officer may still find that probable cause exists and issue the warrant.[68]

In the Response, the State relies upon *Gardner*, arguing this case is comparable and urges the Court to follow the Supreme Court's analysis therein.[69] However, the State's reliance on *Gardner* is misplaced. *Gardner* involves a continuing activity or criminal enterprise. The State has indicted Mr. Barnes for the murder of Lerrie Tate on December 1, 2022. As such, the State has charged Mr. Barnes with an isolated crime and not an ongoing criminal enterprise.

In *Gardner*, "[t]he affidavit recite[d] a two-year history of drug dealing at the Gardner residence, including evidence of a direct controlled buy and various reports from police officers

---

[66] *Pulgini*, 374 A.2d at 823 (citing *United States v. Johnson*, 461 F.2d 285, 287 (10th Cir. 1972)).
[67] *Id*.
[68] *Henson*, 848 F.2d at 1381.
[69] D.I. No. 39 at 8-9.

9

and anonymous sources."[70] On appeal, Gardner argued that the information in the affidavit was stale given the ten-month gap between an anonymous tip being made and a drug transaction taking place.[71] Despite this time lapse, the Supreme Court found it likely that Gardner's drug activity persisted through the date of the search warrant based on the fact that: (i) the location of the alleged drug activity never changed during the two-year period of suspicion; (ii) the police checked public utility records that confirmed Gardner still occupied the premises; and (iii) drugs were shipped to Gardner on a regular basis.[72] Thus, due to the fact that the criminal activity was ongoing in nature during the ten-month gap, the Delaware Supreme Court found that the affidavit was not stale.[73]

Here, Mr. Barnes' alleged criminal conduct did not involve a two-year long investigation leading up to the application of the search warrant. Arguably, the investigation following the murder may not have justified an eight-month delay in applying for a search warrant. Perhaps, WPD had ample evidence to apply for the Residence Warrant the day the murder occurred. For example, WPD obtained information from two on-scene witnesses, found the mask and sweatshirt near the crime scene, and accessed surveillance footage of the surrounding area that depicts the suspect's description, vehicle, and probable residence. All this evidence pointed to Mr. Barnes as a person of interest that day. The analysis cannot end there, however, as WPD subsequently obtained additional evidence over the following months.

WPD had to wait six months for the DNA results to come back. Then, WPD took additional time to confirm that Mr. Barnes resided at the same address and owned the same vehicle as he did in December 2022. The Affidavit outlines additional investigative steps taken

---

[70] *Gardner v. State*, 567 A.2d 404, 410 (Del. 1989).
[71] *Id*. at 408.
[72] *Id*. at 410-11.
[73] *See id.*

during that eight-month period that led to new evidence implicating Mr. Barnes in Lerrie Tate's homicide.  The Affidavit provides that, on June 13, 2023, WPD received notification from Division of Forensic Science that Mr. Barnes' DNA was associated with DNA taken from the mask recovered at or near the Apartment Building.  WPD then engaged in a motor vehicle search and obtained information from DMV (a VIN search and video surveillance) linking Mr. Barnes to the Lexus observed at the scene.  This information corroborated information already in WPD's possession.

The information obtained after June 13, 2023 corroborated and refreshed the information obtained on or about December 1, 2022.  WPD did not cease its investigation.  Instead, WPD engaged in additional efforts after obtaining DNA result that identified Mr. Barnes as a potential suspect in the homicide.  Accordingly, the Residence Warrant is not based solely on stale information and probable cause existed when the Residence Warrant was issued on August 7, 2023.

   2. ***The circumstances indicated that the items sought in the Residence Warrant were probably still there on August 7, 2023.***

"The inquiry with respect to probable cause in the case of an observation of an isolated incident should focus on all of the relevant circumstances, including the element of time lapse, to determine the probability of the continued existence of the object sought at the place where it was last seen."[74]  "The overall approach should be one of flexibility and common sense."[75] "Factors as important as the time element to be considered in determining the existence of probable cause include the nature of the object sought, its location on the premises and the state in which it was observed."[76]  "The nature of the object would encompass such considerations as

---

[74] *Beltempo*, 675 F.2d at 478.
[75] *Id*.
[76] *Id*.

11

whether it is large or small, moveable or fixed, disposable or permanent and innocuous or incriminating."[77]

The Residence Warrant seeks a number of items that WPD believed were located in Apartment C. Specifically, the Resident Warrant sought: the body of Mr. Barnes, black "Nike" sweatpants with the white "Nike" swoosh on the left thigh, white sneakers, gray sneakers, blue jeans, a black long-sleeve shirt with the "Nike" swoosh on the front left chest, any cellular phones, a set of car keys with a key fob for a red 2016 Lexus sedan, a 9 millimeter firearm, accessories, ownership papers, cleaning kits, 9 millimeter ballistic evidence, and forensic crime scene processing including photographs, latent fingerprints and DNA collection.[78]

The State argues these items are "not likely to be consumed, deteriorated or be removed because of indiscriminate access."[79] Further, the State maintains that a firearm is "not readily passed from one person to another because of the nature of the item."[80] In support of its argument, the State points to *Jensen v. State*[81] and *State v. Smullen*,[82] where the Supreme Court and the Court, respectively, found "personal items like shoes, clothing, and a cellular phone are not incriminating in themselves and are normally found in one's home."[83] The State also references *Gardner* to support its contention that staleness does not apply in Mr. Barnes' case since the police confirmed Mr. Barnes lived in the same location as he did when the murder occurred.[84]

---

[77] *Id*.
[78] *See* Aff.
[79] Resp. at 9.
[80] *Id*. ("People who have firearms tend to maintain them due [to] the expense and difficulty in purchasing them. Also, a firearm is a possessory item that carries implication in possession, such as safety and legal concerns that make it unlikely that a person will hand over a firearm in their possession to someone else in a casual transaction.").
[81] 482 A.2d 105 (Del. 1984).
[82] 2009 WL 806600 (Del. Super. Feb. 9, 2009).
[83] Resp. at 10.
[84] *Id*.

In *Jensen*, the defendant attacked the validity of a search warrant based on a 27-day lapse between the date of the victim's attack and the time the State applied for a warrant.[85] Although the crime was an isolated event, the Court found that the 27-day lapse did not invalidate the warrant as a matter of law because the pieces of evidence sought were not incriminating in themselves and each was of the type normally found on one's person or in one's home or automobile.[86]

The items sought in Apartment C are similar to those in *Jensen*. Common sense supports the belief that the items sought, innocuous in nature, would be in the same place as they were eight months prior. Moreover, the clothing items sought in the Residence Warrant are generic, relatively nondescript and nonincriminating.

In *Smullen*, the police were looking for a handgun allegedly used in the indicted offenses.[87] The Court found it was "reasonable to believe that the handgun's owner would still have it on his person, in his residence or his car even two months after using it in a crime" because the defendant was a prohibited person, "which would have made it harder for him to replace the weapon had he discarded it after the crime."[88] The facts in *Smullen* are similar to those in Mr. Barnes' case. As such, *Smullen* is analogous to the case at hand.

WPD confirmed Mr. Barnes still lived in Apartment C at the time the Residence Warrant was executed. In addition, the clothing, sneakers and keys are the type of evidence that is not incriminating in themselves, and each was of the type normally found on one's person or in one's apartment. As in *Smullen*, Mr. Barnes is a person prohibited and it was reasonable to

---

[85] *Jensen*, 482 A.2d at 112.
[86] *Id*. The evidence sought in *Jensen* included a nylon stocking, a revolver, articles of men's clothing, a road map, and body hair from the defendant.
[87] *Smullen*, 2009 WL 806600, at *1.
[88] *Id*.

13

believe he would still have the firearm in his possession because it would have made it harder for him to replace the weapon.

## VI. CONCLUSION

For the foregoing reasons, the Court will **DENY** the Motion.

Dated:  January 29, 2025
Wilmington, Delaware

/s/ *Eric M. Davis*
Eric M. Davis, Judge


cc:      The Prothonotary

14